**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jay R. BISHOP, Defendant–Appellant.**

United States of America,
Plaintiff–Appellee,

v.

Gene R. Cardenaz, Defendant–
Appellant.

Nos. 01–50195, 01–50266.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 5, 2002.

Filed May 30, 2002.

Gerald T. McFadden, San Diego, CA, for defendant-appellant Bishop. Christopher R.J. Pace, Cooley Godward LLP, San Diego, CA, for defendant-appellant Cardenaz.

Robert E. Lindsay, Gregory Victor Davis, Tax Division, Department of Justice, Washington, DC, for the plaintiff-appellee.

Before: GOODWIN, PREGERSON and TROTT, Circuit Judges.

GOODWIN, Circuit Judge:

Jay Bishop and Gene Cardenaz (collectively "appellants") appeal their convictions and sentences for one count of conspiring to defraud the Internal Revenue Service (IRS), in violation of 18 U.S.C. § 371, and two counts each of attempted income tax evasion, in violation of 26 U.S.C. § 7201. We affirm.

The main issue at trial, and on appeal, is whether the appellants' conduct was willful. Each argues (1) that the district court erred in relying on an objective standard

for good faith in determining willfulness, and (2) that the district court improperly excluded as hearsay proffered testimony about willfulness.

Bishop also claims that his waiver of a jury trial was invalid. Cardenaz claims that the district court erred in denying his untimely *Faretta* motion to complete the trial as his own counsel, and in calculating the tax loss for sentencing purposes.

## FACTUAL BACKGROUND

Bishop and Cardenaz, along with Robin McPherson (collectively "defendants"), who is not a party to this appeal, were employed as managers by American Wireless Cable Systems. In 1992, American Wireless sold its marketing business to defendants for $4,275,000. Defendants, as equal shareholders, formed an S-corporation called Continental Wireless Cable to take over American Wireless's marketing business. As an S-corporation, all of Continentals's profits and losses passed through to the shareholders without first being taxed to the corporation. It was undisputed at trial that: (1) some S-corporations commonly designate interim payments to their shareholders as "officer loans" until the end of an accounting period because the classification of profit and loss is uncertain, (2) an S corporation shareholder who is at personal risk may apply the corporate loss against compensation on his or her personal tax return, and (3) an at-risk shareholder may carry losses forward or back to other tax years as may be appropriate under existing regulations.

Continental employed Douglass Lambrose, an accountant who died before trial, to maintain its books and records. Lambrose prepared Continental's general ledger until the summer of 1993, when Continental's in-house accounting staff took over. In addition, Lambrose handled tax matters for Continental, including preparation of Continental's 1992 income tax return. The 1992 return reported a loss of $1,260,826. Continental's disbursements to the defendants were entered as "officer loans" and thus the 1992 tax returns showed no corporate officer compensation. Continental did not file tax returns for 1993 or 1994.

Lambrose's office also prepared Bishop's and Cardenaz's 1992 individual tax returns. The individual returns reported that defendants were at risk in Continental, and each claimed a $420,288 loss from Continental's operations. The loss was also carried back to previous years.

Charles Guskey started working as an accountant for Continental in September 1993. He was generally responsible for accounting relating to the contracts with various partnerships, while Tamberly Halkola did most of the other accounting and bookkeeping tasks as instructed by the appellants. Per defendants' instructions, Halkola continued to enter the payments Continental made to them as "officer loans," although she questioned the lack of documentation.

Appellants sold their marketing business in February of 1994 and formed a general partnership, Diversified Wireless Cable, which received the proceeds from the sale. Later in 1994, the SEC filed a complaint and obtained a TRO against Continental, freezing its operations, its bank accounts, and the bank accounts of its principals. Continental was placed in involuntary receivership, and a receiver was appointed to wind down the affairs of the business. Continental was ordered to prepare an accounting of all funds received and disbursed. Guskey undertook this accounting, but did not complete it. Consequently, the receiver was unable to prepare and file Continental's tax returns for 1993.

Several years later, defendants were indicted for tax evasion, and their bench trial commenced on October 24, 2000 and lasted

until November 3, 2000. The central issue during the trial was whether the "officer loans" made by Continental to its shareholders were reportable income to the shareholders during the tax years in question, and, if so, whether the appellants knew that the loans included reportable income.

The government relied on testimony that Cardenaz referred to the money he received from Continental as income and said he intended to pay taxes on the income "later on." The government argued that the "officer loans" were in fact distributions of income, and noted that there were no promissory notes indicating an obligation to repay, no repayment schedules, no personal collateral, and no authorization for loans in corporate minutes. Guskey testified that he told the defendants at various times that they should show some of the "officer loans" as income. Cardenaz claimed that his inability to obtain copies of Continental's tax returns made it impossible for him to file his own tax returns for 1993 and 1994. Bishop did not testify.

Appellants' main defense was that they could not have been willful in treating the money they received from Continental as "officer loans" because they relied on the professional advice of their accountant, Lambrose. The death of Lambrose in 1995 created difficulty for both sides in presenting their case. Both sides made efforts to obtain testimony relevant to willfulness, but relied mainly on circumstantial evidence. The district court returned guilty verdicts on all counts and imposed guideline sentences of thirty months in custody, as well as financial penalties.

## WILLFULNESS

■ Proof of willfulness is essential to support a conviction under 26 U.S.C. § 7201, which makes it a felony to "willfully attempt[ ] in any manner to evade or defeat any tax imposed by this title or the payment thereof ...." *See United States v. Bishop,* 412 U.S. 346, 361, 93 S.Ct. 2008, 36 L.Ed.2d 941 (1973). Willfulness is also an element of conspiracy to defraud the United States; the government must prove "the existence of an agreement to accomplish an illegal objective, an overt act in furtherance of the objectives of the conspiracy, and intent on [the] part of the conspirators to agree, as well as to defraud the United States." *United States v. Crooks,* 804 F.2d 1441, 1448 (9th Cir.1986).

■ More generally, willfulness is an element in all criminal tax cases. "Willfulness, as construed by our prior decisions in criminal tax cases, requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." *Cheek v. United States,* 498 U.S. 192, 201, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991).

> [C]arrying this burden requires negating a defendant's claim of ignorance of the law or a claim that because of a misunderstanding of the law, he had a good-faith belief that he was not violating any of the provisions of the tax law. This is so because one cannot be aware that the law imposes a duty upon him and yet be ignorant of it, misunderstand the law, or believe that the duty does not exist.

*Id.* at 202, 111 S.Ct. 604. The rationale behind the subjective standard in *Cheek* is to avoid criminalizing unwitting violations of the complicated and extensive tax laws.

■ Good faith reliance on a qualified accountant has long been a defense to willfulness in cases of tax fraud and evasion. *See United States v. Claiborne,* 765 F.2d 784, 798 (9th Cir.1985), *abrogated on other grounds, Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988). "[A] defendant may rebut the Govern-

ment's proof of willfulness by establishing good faith reliance on a qualified accountant after full disclosure of tax-related information." *Id.* This Court has not had occasion to establish the boundaries of this defense.

The trial court considered cases from other circuits dealing with the "good faith reliance on an accountant" defense *after Cheek.* The Fifth and the Seventh Circuits have not modified the requirement that the taxpayer hand over *all* relevant information to the accountant. *See United States v. Becker,* 965 F.2d 383, 387 (7th Cir.1992); *United States v. Masat,* 948 F.2d 923, 930 (5th Cir.1991). The government cites these cases in support of the proposition that requiring full disclosure to establish good faith reliance on professional advice is not inconsistent with *Cheek.* The government argues that if a defendant did not make full disclosure to his accountant, then he probably did not act in good faith. The appellants protest that the subjective good faith standard of *Cheek* should modify the full disclosure traditionally required for a successful good faith reliance on professional advice defense. We agree with the Fifth and the Seventh Circuits.

█ We hold that *Cheek* does not change the rule that a defendant claiming good faith reliance on the advice of a tax professional must have made full disclosure of all relevant information to that professional. The district court applied the correct legal standard when it found the reliance defense inapplicable to defendants because they did not make full disclosures. The district court wrote, in its memorandum decision:

> I have taken into consideration the defense in this case of good faith. That is the good faith that the defendants have alleged that they had in relying upon the advice of the accountant. And I find ... that the government has proved beyond a reasonable doubt will-

fulness despite the defendants' defense
. . . .

And I want to make clear the defendants have no burden in this case. They did not have the burden of showing good faith. The government had the burden of showing willfulness, and the government has met that burden of showing willfulness beyond a reasonable doubt despite the evidence that the defendants each presented regarding good faith reliance . . . .

The term "willfully," I find, is what has been referred to in *Cheek v. United States* . . . .

> "Willfulness as construed by our prior decisions in criminal tax cases requires the government to prove that the law imposed a duty on the defendant and that the defendant knew of this duty and that he voluntarily and intentionally violated that duty."

And I find that that occurred as to each of the defendants in this case.

. . . .

And I find that as far as good faith is concerned, ... the professional advice that the defendants received—first of all, they didn't follow it accurately, but most importantly I find that ... the advice that the professionals gave to the defendants was advice that was not based on ... complete information that should have been given to them by the defendants.

And I find that *because of the defendants' failure to disclose all pertinent facts to the professionals, that the defense is inapplicable or was not sufficient to overcome the Government's proof in this case.* And that is—the Government has proved, I find, based on all the evidence in the case and all the reasonable inferences that I can draw from the evidence that the defendants all acted willfully despite the fact that

they did have professionals that they appeared to rely on.

(emphasis added). Appellants do not challenge the district court's factual findings that they failed to disclose all relevant information to the tax professionals on whose advice they claim to have relied. Because the district court applied the correct legal standard to defendants' "good faith reliance on a professional" defense, and appellants do not challenge the factual findings underlying the decision, the district court did not err on this issue.

## THE HEARSAY OBJECTIONS

■ Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). The district court's decision to exclude evidence as hearsay is reviewed for an abuse of discretion. *United States v. Ortega,* 203 F.3d 675, 682 (9th Cir.2000). "[N]ot every hearsay error amounts to a constitutional violation. At a minimum, a defendant must demonstrate that the excluded evidence was important to his defense." *United States v. Lopez–Alvarez,* 970 F.2d 583, 588 (9th Cir.1992). However, "[e]rror cannot be harmless where it prevents the defendant from providing an evidentiary basis for his defense." *United States v. Saenz,* 179 F.3d 686, 689 (9th Cir.1999).

■ The question is whether the trial court's exclusion of certain testimony prevented the defendants from putting on their defense. Because of Lambrose's death, non-hearsay testimony about the advice he gave defendants was hard to come by. When alleged error is predicated upon a ruling which admits or excludes evidence, we make a two-fold inquiry: (1) whether a substantial right of the party was affected; and (2) when the ruling is one excluding evidence, whether the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked. Fed.R.Evid. 103(a). "In the absence of an offer of proof of what the testimony would have been, ... reversal will lie only where there is plain error." *United States v. Kupau,* 781 F.2d 740, 745 (9th Cir.1986).

Appellants assert that the district court improperly excluded items of testimony from the following four witnesses: Guskey, Cardenaz, Michelle Bishop, and Denise Steffens.

### (a) *Exclusion of Guskey's testimony*

Although Guskey was an accountant for Continental, he did not prepare defendants' individual tax returns, nor did he advise them about their individual tax returns, except to "suggest[ ] that instead of classifying all the loans or all the monies received as loans, that a portion of that be picked up as income." Defendants sought to have Guskey testify about his conversations with them regarding tax advice defendants received from Lambrose and how defendants were going to follow that advice. (Lambrose or an associate had prepared Bishop and Cardenaz's individual tax returns in 1992, as well as Bishop's 1993 return.) Defendants argued for introduction of this testimony on the grounds that (1) it fell within the "state of mind" hearsay exception under Federal Rule of Evidence 803, or (2) it was non-hearsay, as it was proof of defendants' "good faith reliance on expert advice" defense, and was not being offered for the truth of the matter asserted.[1]

---

1. The Guskey Proffer simply mentions Federal Rule of Evidence 705 as a third ground for introducing Guskey's testimony. (Rule 705 deals with "Disclosure of Facts or Data Underlying Expert Opinion.") Appellants do not pursue this argument on appeal.

Appellants' first argument is that Guskey's excluded statements were offered to prove acts that the defendants intended to take in the future—either to seek Lambrose's tax advice or to follow Lambrose's tax advice—and that as statements of intent they qualified as "state of mind" testimony, which is an exception to the rule against hearsay under Federal Rule of Evidence 803(3). Defendants also argue that the statements are excepted from hearsay as statements of motive, namely, that defendants intended to take future action because of Lambrose's advice. *See* Fed. R.Evid. 803(3).

Appellants' second argument is that Guskey's excluded statements were not hearsay at all, because they were not offered for the truth of the state of mind of taxpayers, but rather offered simply to prove that the defendants relied on professional advice. There was no real controversy during the trial that the defendants had been receiving tax advice from their accountant, but there was also no evidence about the substance of that advice. Defense counsel was apparently trying to obtain proof of what Lambrose had told the defendants through Guskey's testimony. Guskey knew only what, if anything, he had been told by Lambrose.

On cross-examination, the government elicited from Guskey that he had suggested to the defendants that some portion of the officer loans should be reclassified and treated as income. The trial court also asked Guskey some follow-up questions on this subject. On re-direct examination, defense counsel attempted to elicit testimony from Guskey to clarify his advice about the officer loans. ("[W]asn't it your understanding from talking to Mr. Lambrose and the principals that the officer loans indeed were going to convert to a compensation when the system transferred?") The government objected on the basis of hearsay, and the court sustained the objec-

tion, even when defense counsel pointed out that the government had "opened the door" with its questioning.

The government argues on appeal that any statements that defendants made to Guskey about advice they received from Lambrose and statements that Guskey made to Lambrose about that advice were excludable as "statement[s] of memory or belief to prove the fact[s] remembered." Fed.R.Evid. 803(3). Both defendants' and Lambrose's statements to Guskey were statements of recollection of past events (Lambrose giving advice to defendants) and were offered to prove the fact allegedly remembered (that Lambrose gave advice to defendants). Statements of memory to prove the fact remembered are excluded from the "state of mind" exception in Rule 803(3).

■ Assuming *arguendo* that the government's objection mischaracterized the question as eliciting hearsay, the real question is whether the defendants were denied the right to present their defense. The court's refusal to hear the remembered advice was not prejudicial because there was no real dispute. The testimony, if allowed in, would have proved only that the defendants understood that the money received could be treated temporarily as a loan, and could be "realized" as income at some future time when it would then become taxable. However, at trial, there was no serious dispute about the validity of that accounting strategy. The dispute was whether the defendants intended to treat the "officer loans" as loans indefinitely in the hope that the taxability of the income as income would go away. On this point, the hearsay was irrelevant, and properly excluded on that account.

The government also argues that the district court did not improperly prevent Guskey from testifying about statements he made to defendants about officer loans.

The government cites various portions of Guskey's testimony on direct and cross examination, and notes that defendants fail to identify other relevant statements about which Guskey was precluded from testifying.

■ Furthermore, the government alleges that Guskey was not defendants' tax accountant or advisor, and that there was no evidence that defendants relied on Guskey's advice. Even if Guskey's statements to defendants about the substance of Lambrose's alleged advice were wrongly excluded, the alleged error did not deprive them of their defense that they in good faith relied on professional advice. The court heard in several forms the defense that the defendants had acted on the advice that the officer loans were at least a temporary tax shelter. The question at trial was whether the defendants knew that at some time the so-called loans would have to be realized and reported as income.

■ In their reply briefs, appellants contend that Guskey's excluded testimony did not relate solely to what the defendants had told him about Lambrose's past tax advice to defendants. Appellants cite Guskey's proffer as support for their argument that Guskey's statements would have shown acts that defendants *intended to take in the future* in following Lambrose's tax advice. (According to the proffer, defendants told Guskey, *e.g.*, that "they would record the money [that they were presently receiving as officer loans] as income" in the future.) Statements of intent to perform a future act are admissible "state of mind" testimony under Rule 803(3). However, it was for the trier of fact to determine whether, in good faith, the defendants ever intended to report their receipts as income and pay the taxes on the income. The trier of fact found that the defendants did not in good faith

intend to pay taxes on the money they received.

Any error in excluding Guskey's testimony about what defendants told him they intended to do or why they intended to do it was harmless. Such testimony may fall under the "state of mind" exception to the rule against hearsay, but it would still be self-serving, and duplicative of the defendants' own testimony about their state of mind, if they chose to testify. The best evidence would be the defendant's own testimony. In a jury trial, Guskey's seconding the defendants' statements that they "would record the money as income" in the future (intent) and that they "had been following tax advice of outside consultants" (motive) might have been helpful to the defense. In a bench trial, however, such testimony would have been cumulative and virtually irrelevant.

■ We hold that the district court properly excluded as hearsay Guskey's testimony about what Lambrose told him regarding the advice Lambrose gave the defendants. Contrary to appellants' claim, such testimony was offered to prove the truth of the matter asserted: Lambrose gave defendants certain advice, and they relied on that advice. No one cares what Lambrose told Guskey *except* if it were true that Lambrose gave the defendants certain advice. Defendants did not testify about the advice Lambrose had given them, nor did they testify that they had turned over all relevant information to Lambrose about payments received by them.

■ Also, Guskey was properly prevented from testifying about what defendants told him Lambrose had told them. That would have been hearsay, and only second-hand testimony about defendants' state of mind at the time, a subject about which they could be examined and cross-examined if they took the stand.

But as a second-hand "statement of memory or belief to prove the fact remembered," as the government points out, it is not only hearsay, but irrelevant hearsay.

(b) *Exclusion of Cardenaz's testimony*

■ When Cardenaz took the stand, his counsel asked him the following series of questions:

Q: And did [Lambrose] give you tax planning advice as far as your compensation was concerned?

A: Yes. I got all of my tax planning advice from Lambrose.

Q: And is that when the subject of officer loans came up?

A: Yes.

Q: Would you tell us what Mr. Lambrose told you in that regard?

Mr. Roetzel: Objection. Hearsay.

The court: Sustained.

This was error. Cardenaz had the right to tell the court his own version of the tax advice on which he claimed to have relied. He would, of course, be subject to cross-examination on the nature of the information that he gave to Lambrose. On appeal, Cardenaz argues that Lambrose's advice was not introduced for its truth, but rather for its effect on Cardenaz and his lack of willfulness to violate federal tax laws, and therefore was not hearsay. *See* Fed. R.Evid. 801(c). Although the court erred by excluding Cardenaz's testimony, the error was harmless. By the time Cardenaz testified about his reliance on Lambrose's unspecified advice, the court already knew about the undisputed evidence of several hundred thousands of dollars that had flowed into defendants' bank accounts, of which Lambrose had known nothing. In view of the overwhelming evidence of undisclosed sums received by the defendants without Lambrose's knowledge, whatever Lambrose may have told Cardenaz was irrelevant to defendants' claim of good faith reliance on a professional.

The government contends that defendants did not inform the court that Lambrose's statements were not offered for the truth of the matter, asserted. The government also asserts that Cardenaz's testimony would have been irrelevant with respect to Bishop, because Cardenaz's state of mind upon hearing Lambrose's advice had no bearing upon Bishop's willfulness in violating the tax laws.

Appellants argue that they were not required to inform the district court that the statements were not being offered for the truth of the matter asserted, because it was "apparent from the context of [Cardenaz's] testimony" why they were being offered, quoting *United States v. Chang*, 207 F.3d 1169, 1176 (9th Cir.2000), and because the district court made it clear in excluding Guskey's testimony that it would not allow answers to questions about Lambrose's tax advice, *cf. Heyne v. Caruso*, 69 F.3d 1475, 1481–82 (9th Cir.1995).

■ Finally, appellants state that even if they did not make a proper proffer of Cardenaz's testimony at trial, they are still entitled to plain error review of the district court's decision to exclude the evidence. They argue that a defendant raising a good faith reliance defense is entitled to offer evidence of what he relied upon, even over a timely hearsay objection. The proposition is correct in principle, but on this record, the trial court's rejection of the evidence for the wrong reason does not entitle the appellants to a new trial. There was no evidence to support their claim that they relied on professional advice *after full disclosure of relevant facts*. There was no reversible error in dealing with Cardenaz's testimony.

(c) *Exclusion of Michelle Bishop's testimony*

Defense counsel asked the following series of question of Michelle Bishop, Jay Bishop's wife:

Q: Did you have any discussion with Chuck Guskey about your 1993 taxes?
A: Yes, I do recall casual conversations with Mr. Guskey regarding the taxes, yes.

. . . .

Q: And would you talk to him about your personal tax returns or tax liabilities?
A: He did give advice regarding tax returns, yes.
Q: And to your recollection, what was his—did he give you any advice about the 1993 taxes?

. . . .

Ms. Hendrickson: Objection.
The court: . . . She can answer that question. Did he give you advice, "yes" or "no"?
The witness: Yes, he did.
By Mr. Warren:
Q: Did he give you advice? Was Mr. Bishop present at that time?
A: Yes, he was.
Q: And what advice did he give you about your 1993 returns?
Ms. Hendrickson: Objection.
The court: Sustained.
Mr. Warren: Your honor, it would go to state of mind.
The court: Sustained.

Appellants argue that Ms. Bishop should have been allowed to testify about the tax advice Guskey gave her and her husband, because these statements were offered to show Bishop's good faith reliance on a tax professional. Further, defendants claim that Guskey's statements were not hearsay because they were not offered for the truth of the matter asserted. Rather, these statements were "evidence responsive to the government's theory of the case that the defendant ignored professional advice, relevant for its effect on the hearer, and relevant as circumstantial evidence of the hearer's state of mind."

The government responds that "[t]he testimony sought to be adduced from Michelle Bishop regarding Guskey's advice with respect to the Bishops' 1993 tax return was irrelevant and properly excluded." In support, the government argues that Ms. Bishop testified that Lambrose, not Guskey, was the tax professional on whose advice the Bishops relied to prepare their 1993 return, and Mr. Bishop never advised the court by objection or proffer that he relied on Guskey in preparing his 1993 return. Also, Guskey testified that he never saw the Bishops' 1993 return and that the only tax-related advice that he gave defendants was that some part of the monies classified as officer loans should be reclassified as income.

■ Appellants preserved their argument that Ms. Bishop's testimony would prove "state of mind" and therefore be a hearsay exception under Rule 803(3). Guskey testified that he advised the defendants to consider reclassifying some of the officer loans as income, and Ms. Bishop confirmed that Guskey gave the Bishops advice regarding their tax returns. While Ms. Bishop's own state of mind was not an issue in the case, her testimony would have been relevant and would have qualified as circumstantial evidence to prove Bishop's state of mind. Bishop's state of mind is also relevant to Cardenaz, as they were convicted of conspiring, and this crime requires willfulness.

We review a district court's hearsay error for harmlessness. Again, because this was a bench trial, and there was no doubt that the defendants had relied on professional advice that "officer loans" were at least temporarily legitimate, the exclusion of this specific testimony was harmless. The trier still had to decide whether the total failure to report the income for the relevant tax years was willful.

### (d) *Exclusion of Steffens's testimony*

██ Denise Steffens was director of operations at Continental. She testified that defendants seemed to take seriously the things that Lambrose told them. Defense counsel then asked Steffens whether defendants "made it clear to[her] that they would defer to [Lambrose] in terms of how to set up the accounting and those sorts of things." The court sustained the government's objection to this question as calling for speculation. Defendants did not object to the court's evidentiary ruling. Because "[e]rror may not be predicated upon a ruling which . . . excludes evidence unless a substantial right of the party is affected, and . . . the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked," Fed.R.Evid. 103(a), we review for plain error. *See also United States v. Kupau,* 781 F.2d 740, 745 (1986). ("In the absence of an offer of proof of what the testimony would have been, . . . reversal will lie only where there is plain error.") Exclusion of this testimony does not meet the high standard of plain error because it is not "clear" or "obvious" that the question did not call for speculation. *See United States v. Randall,* 162 F.3d 557, 561 (9th Cir.1998).

In conclusion, the district court, in a seven day trial, made several rulings that excluded evidence. In many of these instances, defendants did not preserve the point at trial, and we can review only for plain error, a standard that these errors do not meet. However, the district court did make two rulings to which defendants properly objected. They both involve testimony that should have been admitted to prove defendant's "state of mind" in support of their defense that they did not willfully violate the federal tax laws. The first instance of this is Guskey's testimony about what defendants told him they intended to do with regard to classifying their compensation, and that they were motivated by Lambrose's advice in doing so. The second instance is Ms. Bishop's testimony about Guskey's tax advice to her and her husband. As noted, however, on the whole record, these errors were harmless; the defendants failed to prove that they had disclosed all relevant information to Lambrose, and therefore the content of Lambrose's advice to the defendants was irrelevant.

### THE WAIVER OF JURY TRIAL

Turning to the assignment of error challenging the voluntariness of the waiver of a jury trial, we agree with the trial court.

██ A criminal defendant has the right to a jury trial under the Sixth Amendment. To be valid, a defendant's waiver of this right must be voluntary, knowing, and intelligent, and the defendant must be competent to waive the jury right. *See Patton v. United States,* 281 U.S. 276, 312–13, 50 S.Ct. 253, 74 L.Ed. 854 (1930). In addition, Federal Rule of Criminal Procedure 23(a) requires a defendant who chooses to waive a jury trial to do so "in writing with the approval of the court and the consent of the government."

██ *United States v. Cochran,* 770 F.2d 850, 852 (9th Cir.1985), teaches that trial courts should conduct a thorough and searching colloquy with the defendant before accepting a jury trial waver. But that "the failure of a district judge to conduct such an interrogation does not violate either the Constitution . . . or Fed.R.Crim.P. 23(a); nor does it *ipso facto* require reversal." *Id.* at 851 (citations omitted).

██ In most cases, adherence to the dictates of Rule 23(a) creates the presumption that the waiver was voluntary, knowing, and intelligent. *See id.* In *United States v. Duarte–Higareda,* 113 F.3d 1000, 1003 (9th Cir.1997), we set out

the further safeguard that a colloquy is required where the record indicates that the defendant may have lacked the ability to make an intelligent waiver. This is not such a case. There is no evidence that Bishop suffered from "a special disadvantage or disability bearing upon [his] understanding of the jury waiver." *Id.* He was a sophisticated business proprietor, and he had lawyers at his side at all critical times. Bishop fails to offer any basis for requiring the district court to conduct a colloquy with Bishop regarding his jury trial waiver, and accordingly, any alleged shortcomings in the district court's colloquy are irrelevant.

## CARDENAZ'S FARETTA MOTION

■■■ A criminal defendant has a constitutional right to self-representation under the Sixth Amendment. *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Assertion of this right must be (1) voluntary and intelligent, (2) timely, (3) not for the purpose of delay, and (4) unequivocal. *United States v. Hernandez,* 203 F.3d 614, 620 (9th Cir.2000). The Supreme Court has recognized only two instances in which a criminal defendant's right to self-representation may be overridden by other concerns. First, a defendant cannot choose to represent himself if he is not competent to waive his constitutional right to counsel. *Id.* at 621 n. 8. A defendant must "knowingly and intelligently forgo[ ] his right to counsel." *McKaskle v. Wiggins,* 465 U.S. 168, 173, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984). Second, the defendant cannot represent himself if he is not "able and willing to abide by the rules of procedure and courtroom protocol." *Id.* "Where a defendant's waiver of his Sixth Amendment right to counsel meets these requirements, a court must permit the defendant to proceed pro se." *Hernandez,* 203 F.3d at 620–21.

■■■ Cardenaz fails to establish that the district court erred in denying his request to represent himself. His request was untimely. A demand for self-representation is timely if made before meaningful trial proceedings have begun. *Fritz v. Spalding,* 682 F.2d 782, 784 (9th Cir. 1982). In cases involving jury trials, we have held that a request is timely if made before the jury is selected or before the jury is empaneled, unless it is made for the purpose of delay. *United States v. Smith,* 780 F.2d 810, 811 (9th Cir.1986). Even if a request is timely, we consider "whether [defendant] had bona fide reasons for not asserting his right of self-representation until he did" and determine whether defendant "could reasonably be expected to have made the motion at an earlier time." *United States v. Kaczynski,* 239 F.3d 1108, 1116 (9th Cir.2001) (citation and internal quotation marks omitted).

At the start of the proceedings on the third day of trial, Cardenaz moved to represent himself for the remainder of the trial. By this point in the trial, the judge had already heard testimony from five witnesses and received more than 100 exhibits. Cardenaz stated that he wanted to give his own closing argument and that he and his attorney were not in agreement about how to proceed in the trial. It is apparent that Cardenaz thought he could make a better closing argument than his attorney by giving his unsworn version of the facts at closing without the inconvenience of being cross-examined. There was no error in rejecting this untimely motion, the granting of which could have impaired the rights of his codefendants.

## CALCULATION OF TAX LOSS

■■■ Finally, Cardenaz assigns error to the trial court's calculation, for sentencing purposes, of the tax loss to the government

from defendants' conduct. There was no error.

■ United States Sentencing Guideline (U.S.S.G.) § 2T1.1(c)(2), application note (A) states, in relevant part, "If the offense involved failure to file a tax return, the tax loss shall be treated as equal to 20% of the gross income ... less any tax withheld or otherwise paid, *unless a more accurate determination of the tax loss can be made.*" U.S.S.G. § 2T1.1(c)(2) (emphasis added). "In determining the total tax loss attributable to the offense ..., all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated." U.S.S.G. § 2T1.1, cmt. n. 1. Tax loss is determined from the reasonably foreseeable conduct of all co-actors, not just the defendant's own conduct. "In some instances, such as when the indirect methods of proof are used, the amount of the tax loss may be uncertain; the guidelines contemplate that the court will simply make a reasonable estimate based on the available facts." U.S.S.G. § 2T1.1, cmt. n. 1.

■ Cardenaz alleges that the district court erred when it (1) failed to use "married filing separately" status for Cardenaz in calculating the tax loss for 1993, and instead used "married filing jointly" status; (2) failed to establish the itemized deductions to which he and his codefendants were entitled in 1993 and 1994, and instead used the standard deductions; and (3) failed to deduct certain sums from Cardenaz's income. The third argument, regarding the sums that Cardenaz claims should have been deducted from his income, was not among Cardenaz's objections to the pre-sentence report, and therefore, it is waived on appeal. *See United States v. Manarite*, 44 F.3d 1407, 1419 n. 18 (9th Cir.1995).

The first error that Cardenaz alleges is that the court failed to use "married filing jointly" status in calculating the tax loss for 1993, and instead used "married filing separately" status, which resulted in a higher tax loss. Although Cardenaz did not file a 1993 return, his wife filed a return on which she indicated her status as "married filing separately." The government replies that because "the base offense level applicable to Cardenaz's conduct would have been the same whether the defendants' proper filing status was joint or separate", "[i]t is unnecessary to decide whether it was error to calculate defendant's tax loss based on married filing jointly status for 1993." The government persuasively argues that even if the status of each defendant for each year in dispute were changed to "married filing separately," the total tax loss attributable to Cardenaz's conduct would have been between $950,000 and $1,500,000, the range that the district court used for sentencing. Cardenaz fails to take into account that, if the tax loss were calculated using "married filing separately" for each defendant when it was arguably appropriate, the tax loss would also have necessarily included the loss attributable to the each spouse's failure to report her share of her husband's (defendant's) income under California's community property laws. Because the defendants were convicted of conspiring to defraud the IRS, the total tax loss, including the loss through the spouses, is attributable to each defendant. *See* U.S.S.G. § 2T1.1, cmt. n. 2. Tax loss is determined from the reasonably foreseeable conduct of all co-actors, not just the defendant's own conduct. There was no error.

■ Cardenaz claims that the district court also erred in accepting the government's calculation of tax loss because it did not itemize the deductions to which de-

fendants were entitled in 1993 and 1994. According to Cardenaz, because the government's calculation used the standard deduction, the calculation was not a "more accurate determination" of tax loss than the default 20% of gross income set forth in U.S.S.G. § 2T1.1(c)(2) cmt. n. A (2002); therefore, the district court should have used the default. The government argues that the sentencing court need "simply make a reasonable estimate based on the available facts," *see* U.S.S.G. § 2T1.1, cmt. n. 1, and that the "available facts" in this case did not include any information on itemized deductions. Furthermore, Cardenaz did not offer such information at the time of sentencing. The government points out that "deductions are a matter of legislative grace, and taxpayers bear the burden of proving entitlement to any deductions claimed." *Everson v. United States*, 108 F.3d 234, 236 (9th Cir.1997) (citation omitted). Cardenaz counters that even if such information was not "available" because it was not at issue in the trial, and even if it was not offered at sentencing, the government bore the burden of proving tax loss at sentencing, citing *United States v. Montano*, 250 F.3d 709, 713 (9th Cir.2001). It is not the government's or the court's responsibility to establish the defendants' itemized deductions, if no itemized deduction information was offered by the defendants. Using the standard deduction is a "reasonable estimate" given the "available facts." The district court's reliance on the government's tax loss calculations was not clearly erroneous. *See id.* at 714.

AFFIRMED.